Littleton, Judge,
delivered the opinion of the court:
In this case plaintiff seeks to recover $2,441.59 as reimbursement for certain increased costs incurred by it by reason of its compliance with the provisions of the National Industrial Recovery Act of June 16, 1933, 48 Stat. 195, and the President’s Reemployment Agreement thereunder in furnishing material for use in constructing a Post Office Building in Philadelphia. The suit is brought under the act of June 25, 1938, chap. 699, 52 Stat. 1197, which conferred upon this court jurisdiction to hear, determine, and enter judgments against the United States upon claims of the contractors, including ■completing sureties and all subcontractors and materialmen performing work or furnishing material to the contractor or another subcontractor, whose contracts were entered into on or before August 10, 1933, “for increased costs incurred as .a result of the enactment of the National Industrial Recovery Act.” The act further provided that it should not be interpreted as raising any presumption or conclusion of fact or *719 law but should be held solely to provide for trial upon the facts as may be alleged, but that judgments under the act “shall be allowed upon a fair and equitable basis.”
Both parties have made and submitted full and complete audits of plaintiff’s operations prior and subsequent to the enactment of the Becovery Act and the signing of the President’s Beemployment Agreement, and there is no dispute between the parties as to the accuracy of the figures in either audit but the parties disagree, first, as to the period of operations prior to the signing of the Beemployment Agreement to be used in determining manufacturing costs to be deducted from such costs incurred subsequent to the signing of such agreement; second, as to the number of bricks supplied for use on the Government contract to which the increased cost a thousand bricks after the signing of the Beemployment.'Agreement should be applied; and, third, the amount of that portion of plaintiff’s claim resulting in increased costs through loss of efficiency by reason of the necessity of having to employ new and untrained men in operating the plant in fulfillment of the contract for furnishing materials for use in construction of the Post Office Building at Philadelphia in conformity with restrictions, and requirements of the Beemployment Agreement.
December 8, 1932, and prior to the enactment of the National Industrial Becovery Act plaintiff entered into an agreement with John B. Kelly, Inc., brick mason subcontractor for the Philadelphia Post Office Building, for future delivery to Kelly of approximately 2,500,000 sand lime bricks as required and called for by Kelly in connection with the subcontract construction work. The evidence shows, without dispute, that plaintiff accepted the order of Kelly and agreed to furnish the necessary number of bricks for $9.50 a thousand in order to help keep its plant running, thus saving losses from inaction of the plant, although plaintiff expected to derive little or no profit from the contract at that price. During the year 1932 plaintiff’s brick plant was operated only to the extent necessary to fill such orders as it received and during the last six months of 1932 the plant was operated only two or three days a month. Plaintiff did not have sufficient open area at its plant to store a large quantity of *720 brick and, in 'addition to this, it was the custom of the trade, and more economical, to ship bricks directly from the brick-making machines to railroad cars or trucks, which practice resulted in a saving of $1 a thousand in handling charges. In April 1933 the Kelly Company gave plaintiff a call under its contract for production of bricks and in a continuous operation for approximately ten days plaintiff produced 193,000 bricks which, added to other bricks on hand, were delivered. No further calls for bricks were made by Kelly until October 1933. In the meantime, the National Industrial Recovery Act was approved June 16, 1933, and thereafter, on July 28,1933, plaintiff signed the President’s Reemployment Agreement pursuant to the Recovery Act. In October 1933 Kelly made calls on plaintiff for continuous delivery of brick and in compliance with the President’s Reemployment Agreement the plaintiff, whose plant had been idle since the end of April 1933, shortened its weekly hours of work, increased the pay of its employees, and fully complied with all the terms and provisions of the Reemployment Agreement. After October 1,1933, plaintiff manufactured and delivered, for use in the construction of the Philadelphia Post Office, 1,575,656 bricks, of which 1,393,906 were actually manufactured under the terms and conditions of the Recovery Act and the Reemployment Agreement. The difference of 181,750 brick delivered after October 1, 1938, came out of plaintiff’s inventory of the stock on hand at the time plaintiff signed the Reemployment Agreement on July 28, 1933, which bricks had been manufactured prior to that date.
Both parties agree that plaintiff’s direct labor cost in manufacturing and furnishing bricks in the construction of the Philadelphia Post Office was $3.1274 a thousand after the enactment of the Recovery Act and the signing of the Reemployment Agreement; and while the parties are not in disagreement as to the direct labor cost for manufacturing bricks prior to signing of the Reemployment Agreement, they are not in accord as to the period prior to the signing of such agreement which should be used for the purpose of determining the average direct labor cost per thousand to be applied to the costs subsequent to the date on which plaintiff *721 signed and thereafter complied with the Reemployment Agreement for the purpose of determining the increased direct labor cost for which plaintiff, under the act of June 25, 1938, is entitled to reimbursement'.' The defendant has used a 12 months’ period, July 1932 to June 1933, inclusive, and, by so doing, has arrived at a prior direct labor cost of $2.35 a thousand bricks manufactured, which price is arrived at by averaging the direct labor cost over such one-year period. This gives a subsequent N. R. A. increased cost of $0.7734. Plaintiff has used, for the purpose of determining the prior direct labor costs, the six months’ period January to June 1933, inclusive, which it insists should be used because it is more nearly comparable to the operations incident to furnishing the material in question after the signing of the Reemployment Agreement, and arrives at a prior direct labor cost of $1.7694. This gives a subsequent N. R. A. increased cost of $1.3580. The direct labor cost in manufacturing such bricks as plaintiff did manufacture during the last six months of 1932 was $2.9050 a thousand. Upon the evidence and circumstances disclosed by the record, we think plaintiff is correct and that the prior average direct labor cost of $1.7694 over a period of six months from January to June 1933, inclusive, is fair and equitable and more nearly comparable to the subsequent operations of plaintiff in fulfilling its contract and that this average direct labor cost should be used in determining the amount of subsequent increased cost for which the act of June 25, 1938, authorizes reimbursement to plaintiff. On this basis plaintiff’s increased direct labor cost after the signing of the Reemployment Agreement was $1.3580 a thousand bricks and, when applied to 1,393,906 bricks thereafter manufactured at the increased rate, amounts to $1,892.92, for which judgment will be entered. Plaintiff had operated under its contract with the John B. Kelly Company in manufacturing and furnishing bricks for use in the Philadelphia Post Office Building for about six months prior to the signing of the Reemployment Agreement and thereafter operated in the fulfillment of such contract for about six months, or until February 1934. The operating conditions and costs during these two periods, except for the changed conditions brought about by the *722 enactment of the Eecovery Act and the signing of the President’s Eeemployment Agreement, were, as the record discloses, the same.
The next item in plaintiff’s claim relates to the number of' bricks to which the subsequent National Industrial Eecovery Act increased cost of $1,358 a thousand should be applied. The plaintiff contends that this increased direct labor cost should be applied to the cost of manufacturing 1,575,656 bricks instead of 1,393,906, or a difference of 181,750 bricks,, for the reason that the last-mentioned number of bricks was manufactured for the Philadelphia Post Office prior to enactment of the National Industrial Eecovery Act and was subsequently delivered; and that it should be permitted to replenish its inventory, and include costs of so doing as a part of its increased cost after the signing of the Eeemployment Agreement. We think this item of the claim cannot be allowed under the provisions of the act of June 25, 1938. The bricks were not manufactured and delivered under conditions imposed by the Eecovery Act and the Eeemployment Agreement, and the act of June 25, 1938, does not authorize the enti'y of judgment for loss of a possible profit on material previously manufactured which might otherwise have been disposed of. Cf. David Pollock, et al. v. United States, 91 C. Cls. 257. Moreover, it is clear that if plaintiff had manufactured all the brick necessary to the fulfillment of its contract with the John B. Kelly Company prior to enactment of the National Industrial Eecovery Act and the signing of the President’s Eeemployment Agreement no basis would exist for entry of judgment in favor of plaintiff merely because such brick was delivered after enactment of the Eecovery Act and the signing of the Eeemployment Agreement. This item of plaintiff’s claim in the amount of $246.82 is therefore denied.
The next item of plaintiff’s claim is for $547.57, made up of $262.57, wages paid to an extra foreman after the signing of the Eeemployment Agreement, and made necessary by reason of compliance therewith, and $285, increased cost due to and resulting from decreased efficiency in operations due to the necessity of having to employ an extra shift of new and inexperienced laborers in order to comply with the Eeem- *723 ployment Agreement in the fulfillment of the contract to furnish the material necessary for construction of the Federal Post Office Building at Philadelphia. The evidence of record establishes the correctness of these amounts and we think that under the provisions of the act of June 25, 1938, they are allowable in the circumstances disclosed. These increased costs directly resulted from -the reduction in the weekly hours of work from 70, and in rush periods of 84 hours a week, to the minimum required by the Unemployment Agreement which reduction in hours compelled plaintiff, in order to fulfill the requirements of its contract for the delivery of material for use in the Philadelphia Post Office Building, to employ an extra foreman and engage an additional night shift of employees, and this required the training and breaking in of about twenty-five additional new men.
No. 44347.
March 3, 1941
Upon the facts disclosed, and for the reasons stated, plaintiff is entitled to recover $2,441.59, and judgment will be entered in its favor for that amount. It is so ordered.
Green, Judge; and Whaley, Chief Justice, concur.
Whitaker, Judge, took no part in the decision of this case.
The David Hummel Building Co., (A Corf oration).
The court made special findings of fact substantially as follows:
Plaintiff, an Ohio corporation, on April 17, 1933, entered into a subcontract with the Great Lakes Construction Company, as general contractor, to furnish all limestone required by the prime contract for use in the construction of the Federal Narcotic Farm, at Lexington, Ky., which contract was completed by the general contractor and final settlement authorized by the Treasury Department.
On August 17,1933, when plaintiff had supplied 34.7% of the total stone under its subcontract, it signed and entered into an agreement with the President of the United States known as the President’s Reemployment Agreement duly *724 authorized by the National Industrial Recovery Act approved June 16, 1933, 48 Stat. 195. - Under this agreement plaintiff,, from and after August 17, 1933, increased the pay of its employees, reduced the total weekly hours of work in its plant,, increased the pay of its truck drivers, paid assessments to the. Code Authority for the Limestone Industry, and paid compensation and public liability insurance on the increased! wages in the fabrication and delivery of the cut stone called, for by its subcontract with Great Lakes Construction Company.
Plaintiff paid out in increased costs from and after-August 17, 1933, up to May 11, 1934, on which date it completed its said subcontract, on account of increased direct labor costs in its plant for the production and fabrication of the cut limestone delivered between August 17, 1933, and May 11, 1934, the sum of $2,670.90; paid increased wages to. its truck driver's in the delivery of said materials the sum of" $673.00; paid,the- sum of $31.20 for compensation insurance, on said increased pay rolls; and paid to the Code Authority-in assessments the sum of $242.42, or a total sum of $3,617.52. All these increased costs resulted from compliance by plaintiff" with the agreement referred to above.
The court decided that the plaintiff was entitled to recover;
Littleton, Judge, delivered the opinion of the court: The plaintiff, as a subcontractor for the Great Lakes Construction Company, the prime contractor engaged by the defendant to construct the Federal Narcotic Farm at Lexington, Kentucky, had completed 34.7% of its work on August 17, 1933, on which date it signed the President’s Reemployment Agreement as authorized by the National Industrial Recovery Act of June 16, 1933, 48 Stat. 195. Plaintiff complied with this agreement and in so complying it incurred excess and increased costs as set forth in the findings in the-amount of $3,617.52 in the execution of its subcontract from and after August 17, 1933, in furnishing the cut limestone specified and called for by the prime contract between the-defendant and the Great Lakes Construction Company.
Plaintiff duly filed a claim with the Department concerned" pursuant to the act approved June 16,1933, within the period *725 specified in that act but received no settlement on its claim. The total of the increased costs set forth in finding 6 directly resulted from compliance by plaintiff Avith the National Industrial Eecovei’y Act and the President’s Beemployment Agreement authorized by such act. The plaintiff is therefore entitled to recover the amount of such increased costs and judgment will be entered in its favor for $3,617.52. It is so ordered.
No. 44072.
April 7, 1941.
Green, Judge; and Whaley, Chief Justice, concur.
Whitaker, Judge, took no part in the decision of this case.
Electric Boat Company, A Corporation.
The court made special findings of fact substantially as follows, upon the stipulation of the parties:
On June 29, 1931, plaintiff entered into an agreement, being Contract NOD-311, with defendant through its representative, C. F. Adams, Secretary of the Navy, for the construction of a fleet submarine (cruiser type) not to exceed 1,150 tons standard displacement, later known as the U. S. S. Cuttlefish.
Pursuant to the National Industrial Becovery Act a code of fair competition known as the “Code of Fair Competition for the Shipbuilding and Shiprepairing Industry” (hereinafter referred to as the- Shipbuilding Cod.e) was approved by the President of the United States on July 26,1933, and, as amended,' ivas thereafter enforced as a law of the United States until declared unconstitutional by the Supreme Court on May 27,1935.
The plaintiff became a party to the Shipbuilding Code on August 5,-1933, and in accordance with the provisions thereof commenced on August 6, 1933, to operate its plants and yards, including its yard at Groton, Connecticut, where the U. S. S. Cuttlefish was being constructed, and continued to so operate its plants and yards until the National Industrial Becovery Act and the Shipbuilding Code, promulgated pursuant thereto, were declared unconstitutional.
*726 After August 5, 1933, in accordance' with said code, plaintiff' reduced the normal work week of its plant from 40 to 32 hours, using three shifts working six days per week. The number of men directly employed on the U. S. S. Cuttlefish was increased thereby approximately 35%.
It was also found by the court that the increased costs as a result of compliance with the said code, between August 6, 1933, and October 27, 1934, when the IT. S. S. Cuttlefish was substantially completed, was $45,358.23 for direct labor and for compensation and liability insurance, and $5,799.25 for supervision and other items, which are set forth in the findings, totaling $51,157.58.
Owing also to the reduction in hours, an extension of 77 calendar days was granted by the Secretary of the Navy for the completion of the contract.
The court decided that the plaintiff was entitled to recover.
Whaley, Chief Justice,
delivered the opinion of the court:
The facts in this case have been stipulated and disclose that the Secretary of the Navy, upon the completion of the ■contract, made a finding of fact that the plaintiff had been delayed by reason of its compliance with the Shipbuilder’s Code and, in addition, had incurred increased costs by reason of the reduction of hours, the employment of additional •employees, and the establishment of a shift system in carrying out the provisions of the National Industrial Eecovery Act, June 16,1933,48 U. S. 195.
The items sought to be recovered are not in dispute and are included within the terms of the act of June 16, 1934 (U. S. C., Title 41, § 28-33, as amended by the Act of June 25, 1938, 52 Stat. 1197).
The plaintiff is entitled to recover the sum of $51,157.58. It is so ordered.
MaddeN, Judge; JoNES, Judge.; and Littletoh, Judge, concur.
Whitaker, Judge, took no part in the decision of this case,
*727 No. 44273.
April 7, 1941.

Anchor Goal Company, A Corporation.

The court made special findings of fact substantially as follows:
Plaintiff, a Missouri corporation, engaged in the retail coal business with its principal place of business in St. Louis, Mo., on May 26, 1933, submitted a bid to supply 400 tons of two-inch bituminous lump coal at $2.50 per ton to* the United States Appraisers Stores, Treasury Department,. St. Louis, during the fiscal year beginning July 1, 1933,. which bid was'’duly accepted, subject to revision in accordance with the National Industrial Recovery Act of June-16, 1933.
On July 27, 1933, plaintiff signed the President’s Reemployment Agreement under said act. On September 18,. 1933, a Code of Fair Competition for the Bituminous Coal Industry was approved by the President and became effective October 2,1933.
Plaintiff’s bid price of $2.50 per ton was predicated on an agreement with W. L. Miller, a salesman for the Eldnar Coal Mine at Belleville, Illinois, to furnish the coal at the mine at $1.15 per ton subject to the National Industrial Recovery Act, on an agreement with a trucker that the drayage from the mine to the building would be 800. per ton and on a current agreement with laborers under which plaintiff was paying them storage or wheeling-in charges at the rate of 200 per ton. The balance of 350 per ton was to be for overhead and profit.
During the months of August and September 1933 plaintiff received the coal for this contract from the Eldnar Coal Mine at $1.15 per ton. For the rest of the coal for this contract plaintiff was required to pay $1.95 per ton, which was the price fixed under the Bituminous Coal Industry Code.
The Code of Fair Competition for the Retail Solid Fuel Industry provided that employees engaged in storing coal on a tonnage basis should be paid not less than the 1929 tonnage rate, which was 500 per ton. Before this code went into effect plaintiff paid for storing the coal 200 per ton, and afterwards 500 per ton.
*728 The cost of delivering the coal from the mine to the building, for which the plaintiff had a contract at 800 per ton, was increased during the fall of 1933 to $1.00 per ton, effective October 1,1933, in accordance with a proposed code for the trucking industry; which code, however, was never approved by the President and never became effective.
In accordance with the contract, plaintiff delivered to the defendant 395.335 tons of coal and was paid therefor the bid price of $2.50 per ton, making a total of $988.34.
It was found by the court that for the reasons and in the circumstances set forth in the findings the plaintiff, in the performance of its contract, incurred increased costs to deliver the coal to the defendant at the United States Appraisers Stores in St. Louis, Missouri, to wit: 800 per ton on 130 tons of coal at the mine on and after October 11, 1933; 200 per ton for the hauling of 357.22 tons of coal from the mine to the building on and after October 11, 1933; and 300 per ton for the storage of 156 tons of coal on and after March 1, 1934, a/s follows:
Hauling 130 tons at 200 per ton-$26.00
Storing or wheeling-in 156 tons at 300 per ton- 46. 80
Host of coal at mine, 357.22 tons at 800 per ton- 285.78
Total_ 358.58
The court decided that the plaintiff was entitled to recover the sum of $253.67, as follows:
Hauling 130 tons at 200 per ton-$26. 00
Storing or wheeling-in 156 tons at 200- 31.20
Increased cost at mine, 357.22 tons, 550-196. 47
Total_ 253. 67
Jones, Judge,
delivered the opinion of the court:
The Anchor Coal Co. instituted this suit to recover the increased costs to which it claims it was subjected in complying with a contract to deliver coal to an agency of the ■Government during the fiscal year beginning July 1, 1933.
These increased costs were alleged to be the direct result of the National Industrial Recovery Act, which was approved June 16, 1933. (48 Stat. 195.)
*729 The action was brought pursuant to an Act of Congress, approved June 25,1938, 52 Stat. 1197, conferring jurisdiction •on the Court of Claims to hear, determine and enter judgment against the United States upon the claims of contractors who performed work or furnished material on contracts entered into on or before August 10, 1933, and whose costs were increased as a result of the enactment of the National Industrial Recovery Act.
Section 3 of the jurisdictional act is as follows:
Judgments or decreep, if any, under this Act, shall be allowed upon a fair and equitable basis, and notwithstanding the bars or defenses of any alleged settlement or adjustment heretofore made, res adjudicata, laches, or any provisions of Public Act Numbered 369, as enacted on June 16, 1934.
The contract was entered into prior to August 10, 1933, .-and provided for the delivery of 400 tons of coal during •the then current fiscal year at $2.50 per ton.
The proof shows that the plaintiff actually incurred increased costs of $404.02 above the' prices that prevailed at the time of entering into the contract.
The evidence ip conflicting, but supplemented by the exhibits establishes the facts set out in the Commissioner’s report.
The bid price of $2.50 per ton was based on an agreement with W. L. Miller, salesman for the Eldnar Coal Company of Belleville, Illinois, to furnish the coal at the mine for $1.15 per ton, an agreement with a trucker for drayage to the building at 800 per ton and an agreement with laborers that the storage or wheeling-in charge would 'be 200 per ton, the remaining 35(4 being allowed for overhead and profit.
After October 1, plaintiff was required to pay $1.95 per ton for coal at the mine, which was the price fixed by the .Bituminous Coal Industry Code.
Of thip increase of 800 per ton the proof shows that 250 per ton was attributable to the seasonal and usual change in prices following the summer months.
The increase of 550 per ton was the result of the enactment •of the National Industrial Recovery' Act and it is fair and *730 equitable that plaintiff should recover this amount on the coal delivered on the contract after October 1,1933.
The Code for the Retail Solid Fuel Industry provided that employees engaged in connection with the storing of coal should be paid not less than the 1929 tonnage rates, which were 500. While plaintiff at the time the contract was entered into was paying only 200 per ton for wheeling-in charges, that was shown to be the lowest price that prevailed at any time, and even so, usually applicable only to-large contracts. Plaintiff had no reasonable right to expect such low wages to remain through a year’s period.
An allowance of 200 per ton to cover the increased cost of storage or wheeling-in charges due to the National Industrial Recovery Act is fair and equitable under the facts of this, case.
The plaintiff had a contract with a trucking company to do hauling at 800 per ton. This company hauled approximately 130 tons after October 11, 1933, at $1.00 per ton.. The evidence shows that this increase was due to the enactment of the National Industrial Recovery Act.
As to the remaining part of the coal that was delivered' after October 11,1933, the evidence is so indefinite as to who-employed those who did the hauling, and as to how muchi and by whom they were paid, a¡s to be wholly unsatisfactory.. It is insufficient as a basis for any affirmative finding.
Plaintiff is entitled to recover $253.67.
It is so ordered.
Littleton, Judge; and Whalet, Chief Justice, concur.